## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

LAUREN ELLWOOD, Special   )
Administrator of the Estate of   )
Steven M. Dick, Deceased,   )
   )
       Plaintiff,   )
   )   Case No. 08 C 4586
     v.   )
   )   Judge Joan B. Gottschall
THE CITY OF CHICAGO, ILLNIOIS,   )
SERGEANT JOHN J. KOHLES #1252,   )
OFFICER DEMETRIUS   )
KOLLIOPOULOS #20142, OFFICER   )
SEAN J. PICKETT #12737,   )
LIEUTENANT ANTHONY WOJCIK   )
#481, OFFICER RICHARD MILZ #21200,   )
OFFICER JUDE R. MARTINEZ 20799,   )
OFFICER SEAN TULLY #11991,   )
   )
       Defendants.   )

## MEMORANDUM OPINION & ORDER

On April 25, 2008, Chicago police officers arrested Steven M. Dick following an investigation into a series of disturbing letters that the police had received threatening an imminent shooting at a local elementary school. The letters threatened retribution for the police's shooting of a wild cougar, which had taken place in Mr. Dick's backyard. The police suspected that Mr. Dick was the author of the threatening letters and arrested him the day before the school shooting was supposed to take place. The police did not charge Mr. Dick with any offenses related to the threatening letters, however, and instead charged him with possessing unregistered weapons and with assault. These charges against Mr. Dick were eventually dropped, and, six years later, another man pleaded guilty to sending the letters.

Mr. Dick sued the City of Chicago and the police officers involved in his arrest, alleging false arrest, involuntary commitment, illegal search, a failure to train, and conspiracy under 42 U.S.C. § 1983, as well as various state-law claims. Mr. Dick has since passed away, and his sister, Lauren Ellwood (the "Plaintiff"), has taken over this litigation as the special administrator of Mr. Dick's estate. Defendants now move for summary judgment on all claims. As explained below, the court finds that the undisputed facts demonstrate that the police acted reasonably in arresting Mr. Dick and taking him to the hospital after he bonded out of police custody. For this reason, Defendants are entitled to summary judgment on the false arrest and involuntary commitment claims. The court also finds that Defendants are entitled to summary judgment on Plaintiff's illegal search, failure-to-train, and conspiracy claims. The court denies summary judgment as to the state-law malicious prosecution claim, as the court finds that there was no probable cause to support the offenses with which Mr. Dick was charged.

## I. FACTS

The following facts are undisputed.

### The Cougar in Roscoe Village

On April 14, 2008, Chicago police received several calls reporting a large wild cougar roaming the Roscoe Village neighborhood on the northwest side of the city. The police tracked the cougar to the backyard of Steven M. Dick, who lived with his elderly father, Eddie Dick. When the police arrived at Mr. Dick's residence, they shot and killed the cougar. Mr. Dick witnessed this shooting.

One week later, the Chicago Fraternal Order of Police received a letter from an unknown sender. The letter threatened that police officers would be shot as retribution for the killing of the cougar. It stated:

> Dear Cougar Killers (aka. Chicago PIG Police)
>
> Prepare to DIE like the Cougar you killed.  On May 4th at your St. Jude Memorial March several PIGS will be shot by snipers.
>
> Mayor Daley: Fuck your father Richard J, Fuck your mother "SIS", fuck your son in Iraq and FUCK YOUR DEAD CHILD.
>
> Burn down the Daley house in Michigan.
>
> Kill any Police Officer, where ever they are found, like they killed the Cougar. . . .
>
> Shame on ALL Police PIGS.

(Defs.' SOF Ex. 13 (CFOP Letter), ECF No. 111-15.)

Around the same time that this letter was sent to the Fraternal Order of Police, similar letters were sent to the Chicago Police Department and St. Xavier University.  The letter sent to the police celebrated the recent death of an officer and threatened to shoot students at a local elementary school.  It stated:

> On February 12th 2007 off duty CPD Officer Jose Vasquez was shot to death . . . . GOOD we are GLAD he is DEAD. . . .
>
> I hope this spic suffered and was shot just like CHICAGO PIGS shot the Cougar.
>
> Jody P. Weis (A FUCKING JEW??????????????)  Too bad Hitler didn't gas your jew family.
>
> Now a student at Audubon Gramm[a]r School will have to be SHOT DEAD like the CHICAGO PIGS shot the Cougar. . . .
>
> KILL A COP like they killed the cougar.
> KILL Jody P. Weis.
> Kill and laugh at all dead cops.
>
> May 4th St. Jude March: snipers on roof tops will shoot a cop
>
> June 1 Family Fun Fair at Audubon school: shoot a kid and poison everyone.
>
> April 26 at Audubon school silent auction: the SOUND of GUN FIRE.

(*Id.* Ex. 15 (CPD Letter), ECF No. 111-17.)  The letter to St. Xavier contained similar threats, including, "Kill any Police Officer, where ever they are found, like they killed the Cougar.  ST. XAVIER MASCOT IS A COUGAR."  (*Id.* Ex. 14 (St. Xavier Letter), ECF No. 111-16.)

*The Investigation into the Letters*

Heather Collins volunteered as an art instructor at Audubon Elementary School and was Mr. Dick's neighbor. After she heard on television about the letter threatening students at the school, she called the school's principal, John Price. She asked Mr. Price about the contents of the letter. Mr. Price told Ms. Collins that the letter referred to "police pigs" and Nazis. He told her that the author of the letter threatened the lives of children and expressed anger about the cougar shooting. Ms. Collins then told Mr. Price that she suspected that her neighbor—Steven Dick—had written the letter because she had heard Mr. Dick use language that was similar to the language contained in the letter. Mr. Price contacted the police detective assigned to the case, Demetrious Kolliopoulos, and told him that Ms. Collins suspected that her neighbor had written the letter.

Detective Kolliopoulos then contacted Ms. Collins on April 24, 2008. She confirmed to the detective that she suspected that her neighbor, Steven Dick, had written the letter because of similarities between the language in the letters and language that Mr. Dick had used in conversations with her and several neighbors. For example, neighbors had told Ms. Collins that Mr. Dick would speak about Nazis and the Ku Klux Klan. Ms. Collins had heard Mr. Dick make racist remarks about African-Americans. She heard Mr. Dick threaten children in the neighborhood. She had seen him wearing military fatigues and waiving around a machete in his backyard. He had boarded the windows to his apartment and installed a surveillance camera in front of his residence. She had seen Mr. Dick training his dogs to attack people. She knew that he believed in conspiracy theories and that he attended militia camps. She routinely saw Mr. Dick carrying a weapon on his belt.

She also told Detective Kolliopoulos about an incident that had occurred between Mr. Dick and his elderly father one day earlier, on April 23, 2008.  That afternoon, Ms. Collins observed Mr. Dick and his father arguing outside of their home.  During the argument, Collins heard Mr. Dick yell, "I'm going to fucking kill you" at his father.  (*Id.* Ex. 4 (Collins Dep.) 93:10, ECF No. 111-4.)  The father called 9-1-1 a few minutes later.  Based on this incident and her other observations of Mr. Dick, Ms. Collins told Detective Kolliopoulos that she felt that Mr. Dick's mental health had worsened and that she feared he could become violent.

Detective Kolliopoulos then spoke with another neighbor, Bevin Strickland.  Ms. Strickland had also heard Mr. Dick use anti-Semitic and racist language.  She recalled an incident when a cable installer stepped onto Mr. Dick's property, and Mr. Dick sicced his dogs on him, yelling, "You fucking nigger, I could kill you right now."  (*Id.* Ex. 6 (Kolliopoulos Dep.) 77:2-78:1, ECF No. 111-6.)  She told Detective Kolliopoulos that she had seen Mr. Dick walking in circles in his backyard while talking to his dogs, saying, "The rest of the Jews should be gassed like the others."  (*Id.* at 89:22-90:4.)  She told Detective Kolliopoulos that one day Mr. Dick told her 11-year old daughter, "Your parents are fucking with me, so I'm fucking with you."  (*Id.* at 80:3-4.)  After Ms. Strickland called the police to report what Mr. Dick had said, he stood under the daughter's bedroom window and yelled, "You think those fucking pigs can stop me?"  (*Id.* at 85:13-17.)  She told Detective Kolliopoulos that she suspected that Mr. Dick had written anonymous threatening notes that she found on her property because the notes matched comments that he had made to Strickland.  One of the notes read, "Better watch out, I'm going to get you like I'm going to get the rest of them."  (*Id.* at 83:23-84:6.)

After speaking to Ms. Collins and Ms. Strickland, Detective Kolliopoulos ran Mr. Dick's name through a police database called Accurint.  The database listed a "Steven Dick" as having

four felony convictions. The birthday listed in the database for this "Steven Dick" did not match the birthday of the Steven M. Dick who lived in Roscoe Village, however, so Detective Kolliopoulos made a note that he would need to verify this information. Detective Kolliopoulos testified that, because of the discrepancy involving Mr. Dick's date of birth, the Accurint report played only a small role in the police's decision to arrest Mr. Dick.

Detective Kolliopoulos and his supervisor, Lieutenant Wojcik, next investigated whether Mr. Dick had purchased any firearms. They learned that Mr. Dick had a Florida Concealed Weapons Permit and a state-issued firearm owner's identification card (a "FOID card"). They learned that he had purchased at least seventeen firearms and had made four purchases in the last seven months, including an AR-15 assault rifle and a high-powered sniper rifle. They checked to see whether any of these firearms were registered. They learned that they were not.

At this time, the date of the threatened shooting at Audubon Elementary School—April 26, 2008—was just one day away. The police had to decide whether to arrest Mr. Dick, based on the information that they had gathered so far, or to conduct further investigation. Based on the interviews with Ms. Collins and Ms. Strickland, the results of the Accurint report showing that Mr. Dick had recently purchased numerous unregistered firearms, the 9-1-1 call from Mr. Dick's father after Mr. Dick had threatened to kill him, and the fact that the cougar shooting occurred in Mr. Dick's backyard, the police decided to arrest Mr. Dick.

*Plaintiff's Arrest*

In the early morning of April 25, 2008, the police set up surveillance of Mr. Dick's residence. One of the officers who surveilled Plaintiff was Sergeant John Kohles. Sergeant Kohles knew Mr. Dick because Sergeant Kohles had hired him to work as a security guard at a night club in 1995. Based on his interactions with Mr. Dick, Sergeant Kohles believed that Mr.

Dick was capable of writing the threatening letters. Mr. Dick had spoken with Sergeant Kohles about firearms, explosives, and anti-terrorist activities. He had spoken about sniping and presented himself as a soldier. Sergeant Kohles relayed this information to the other officers at the scene.

Around 12:30 p.m., Mr. Dick exited his apartment, entered his car, and began to drive away from his home. The police followed in pursuit. After he had gone a short distance, the police stopped Mr. Dick by blocking his path with their squad cars. Two officers approached him with their guns drawn and ordered him to put his hands up. One of the officers opened the car door and placed his hand on Mr. Dick's left forearm to remove him from the car. The officer removed Mr. Dick from the vehicle, placed him on the ground, and handcuffed his wrists behind his back. The officers then stood Mr. Dick up, placed him in an unmarked squad car, and transported him to the 19th District Chicago Police Department.

### The Police's Search of Mr. Dick's Home

When Mr. Dick arrived at the police department, he was brought to an interview room and asked to sign a form indicating that he consented to a search of his home. An officer informed him that the police wished to recover any guns that he had at his home. Mr. Dick signed the consent form. Shortly thereafter, the police accompanied Mr. Dick to his home, where they recovered various firearms, including numerous handguns, an assault rifle, and a sniper rifle.

### Plaintiff's Time in Police Custody

On April 27, 2008, Mr. Dick was charged with ten misdemeanor violations of Section 8-20-040(a) of the Municipal Code of the City of Chicago for possessing unregistered firearms and one count of assault. Lieutenant Wojcik informed Mr. Dick that he could be released on bail if

he signed an individual recognizance bond slip. He did so. Lieutenant Wojcik and Detective Richard Milz then drove Mr. Dick to the Westside V.A. Hospital for a mental health evaluation. Officer Wojcik told a psychiatrist at the hospital that Mr. Dick had made a threat to his father, had made statements about posttraumatic stress, and had received prior treatment for PTSD. The officers then left Mr. Dick at the hospital.

On June 3, 2008, the assault charge against Mr. Dick was dismissed. On July 15, 2008, the other remaining counts were dismissed. Mr. Dick filed suit on August 13, 2008.

## II. LEGAL STANDARD

Summary judgment is appropriate when the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009). "[A] factual dispute is 'genuine' only if a reasonable jury could find for either party." *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). The court ruling on the motion construes all facts and makes all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is warranted when the nonmoving party cannot establish an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

## III. ANALYSIS

### A. False Arrest

Mr. Dick's false arrest claim is premised on his allegation that the police lacked probable cause to arrest him. Defendants argue that the court should grant summary judgment in their favor because the police had probable cause to arrest Mr. Dick, and, even if probable cause was lacking, the individual officers are shielded from liability by the doctrine of qualified immunity.

Probable cause to arrest is an absolute defense to any claim against police officers under § 1983 for false arrest. *Wagner v. Wash. Cnty.*, 493 F.3d 833, 836 (7th Cir. 2007). "Police ordinarily have probable cause if, at the time of the arrest, the 'facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Id.* (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). The court assesses probable cause objectively, considering the facts as they reasonably appeared to the arresting officer, "seeing what he saw, hearing what he heard, and so forth." *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 679 (7th Cir. 2007). Probable cause requires more than a bare suspicion of criminal activity, but it does not require evidence sufficient to support a conviction. *Id.* "Based as it is on probabilities rather than hard certainties, the probable-cause standard inherently allows room for reasonable mistakes." *Gutierrez v. Kermon*, 722 F.3d 1003, 1008 (7th Cir. 2013). When facts sufficient to create probable cause are undisputed, probable cause is a question of law. *Cervantes v. Jones*, 188 F.3d 805, 811 (7th Cir. 1999), *overruled on other grounds by Newsome v. McCabe*, 256 F.3d 747, 751 (7th Cir. 1999).

The doctrine of qualified immunity provides police officers with an even greater level of protection by shielding officers from suit for damages if "'a reasonable officer could have believed [the arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed.'" *Id.* (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)). The protection of qualified immunity applies regardless of whether the officer's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotations omitted). The purpose of the doctrine is to ensure that officers do not err on the side of caution because they fear being sued. *Spiegel v.*

*Cortese*, 196 F.3d 717, 723 (7th Cir. 1999).  For officers to enjoy qualified immunity, it is sufficient that they had only "arguable probable cause."  *Gutierrez*, 722 F.3d at 1008.

### 1.  <u>Possession of Unregistered Firearms (Chi. Mun. Code § 8-20-040)</u>

Defendants argue that Mr. Dick's false arrest claim is barred because they had probable cause to arrest him for possessing unregistered firearms in violation of a Chicago gun registration ordinance that was in effect at the time of the arrest.  That ordinance provided:

> No person shall[,] within the City of Chicago, possess, harbor, [or] have under his control . . . any firearm unless such person is the holder of a valid registration certificate for such firearm. . . .
>
> This section shall not apply to . . . [p]rivate security personnel who possess or control any firearm or ammunition within the City of Chicago; provided that such firearms shall be owned and maintained by the security employing such personnel and shall be registered by the security firm . . . .

Chi. Mun. Code § 8-20-040.

In *City of Chicago v. Haworth*, 708 N.E.2d 425 (Ill. App. Ct. 1999), however, the Illinois Appellate Court held that this ordinance was invalid insofar as it applied to private detectives. The court found that the ordinance was preempted by a state statute regulating private detectives—the Private Detective, Private Alarm, Private Security, and Locksmith Act of 1993, 225 Ill. Comp. Stat. 446/1 *et seq.* (the "Private Detective Act").  The Private Detective Act provided that "[t]he power to regulate the private detective, private security, private alarm, or locksmith business shall be exercised exclusively by the State and may not be exercised by any unit of local government including home rule units."  *Haworth*, 708 N.E.2d at 429 (citing 225 Ill. Comp. Stat. 445/40 (West 1994)).  The court concluded that the Act "expressly provides for preemption of home rule units in regulating the business of private detectives . . . . [B]y excluding private detectives from exemption to the Code, the City attempts to control the

business of private detectives in contravention of State law." *Id.* The court thus vacated a private detective's conviction for failing to register a firearm. *Id.* at 430.

Following the *Haworth* decision, the Chicago Police Department distributed a Special Order that stated:

> Due to the Illinois Appellate Court ruling on the case of the <u>City of Chicago v. Don Haworth</u>, individuals licensed by the State of Illinois under the Private Detective, Private Alarm and Private Security Act of 1993 (225 ILCS 446/1- et seq) are not required to comply with the City of Chicago handgun registration law.
>
> Persons who are licensed under the Private Detectives Act and authorized to carry a firearm are no longer required to register their handgun with the city. Such persons **cannot be charged with the Municipal Code violation (MCC 8-20-040), Failure to Register a Firearm**. . . .

(Pl.'s SOF Ex. 8 (CPD Special Order 78-16) 5, ECF No. 131-9 (emphasis in original))

Mr. Dick was a licensed private detective and security contractor at the time of his arrest. (Pl.'s SOF Ex. 1 (State Licenses), ECF No. 131-1.) Under *Haworth*, then, the police could not have had probable cause to arrest Mr. Dick for violating the municipal ordinance, as the ordinance did not apply to him. Defendants argue that *Haworth*'s holding applied only to the regulation of private detectives in their personal capacities, not in their capacities as owners of security firms. But the *Haworth* court did not make any such distinction—it found that the City of Chicago could not regulate "the business of private detectives." 708 N.E.2d at 429. Nor would such a distinction be consistent with the logic of *Haworth*, as the Private Detective Act regulated private detectives and security personnel in both their individual capacities and in their capacities as owners of security firms. The police's own Special Order confirms this view, plainly stating that "[p]ersons who are licensed under the Private Detectives Act . . . cannot be charged with the Municipal Code violation (MCC 8-20-040), Failure to Register a Firearm." (CPD Special Order 78-16 at 5.) Because the municipal gun ordinance did not apply to licensed

private detectives like Mr. Dick, the police lacked probable cause to charge him with violating the municipal ordinance.

The individual officers will still enjoy qualified immunity, however, if they could have reasonably believed that the municipal ordinance applied to Mr. Dick. Here, the municipal ordinance that was on the books at the time of Mr. Dick's arrest stated that private detectives who owned security firms were required to register their firearms. *See* Chi. Mun. Code § 8-20-040(b)(7). If an officer read only the ordinance without reading the *Haworth* decision, he or she would reasonably conclude that the ordinance applied to private detectives like Mr. Dick. And even were the officer familiar with the *Haworth* decision, that case is at least arguably distinguishable, as it involved the prosecution of a private detective in his personal capacity, not his capacity as an owner of a security firm. The officers here testified that they believed Mr. Dick was required to register the firearms that his security firm owned, and arrested him for that reason. This view of the law, while mistaken, was at least arguably reasonable in light of the language of the municipal ordinance. The court therefore finds that, although they lacked probable cause to charge Mr. Dick with violating the municipal ordinance, the officers are nevertheless entitled to qualified immunity.

### 2. **Disorderly Conduct (720 Ill. Comp. Stat. 5/26-1(a)(1))**

Defendants also argue that the false arrest claim is barred because the police had probable cause to arrest Mr. Dick for disorderly conduct. Here, the court agrees with Defendants. Illinois law provides that a person commits disorderly conduct when he "[d]oes any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace . . . ." 720 Ill. Comp. Stat. 5/26-1. The Supreme Court of Illinois has rejected the view that such an act needs to be public. *People v. Davis*, 413 N.E.2d 413, 415 (Ill. 1980) ("A breach of the peace

may easily occur between two persons fighting in a deserted alleyway as it can on a crowded public street."); *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 717 (7th Cir. 2013) (applying Illinois law and noting that "the conduct at issue need not occur in the public square to threaten to provoke a breach of the peace"). A threat can be sufficient to constitute disorderly conduct. *Davis*, 413 N.E.2d at 416 (finding that the defendant committed disorderly conduct by entering woman's home, waiving sheets of paper at her, and telling her that if her complaint were prosecuted he would carry out undefined threat); *see also Haddad v. Higgins*, 66 F. App'x 62, 64 (7th Cir. 2003) (finding that, under Illinois law, police had probable cause to arrest student for disorderly conduct where student posted threatening messages on website bulletin). Here, Ms. Collins told the police that she had heard Mr. Dick threaten to kill his father during a heated argument outside of their home. Under Illinois law, this was sufficient to establish probable cause to arrest Mr. Dick for disorderly conduct. *See Davis*, 413 N.E.2d at 415.

### 3. **Assault (720 Ill. Comp. Stat. 5/12-1(a))**

Defendants also urge the court to find that the police had probable cause to arrest Mr. Dick for assault based on his threat to kill his father. Illinois law provides that a person commits an assault when "he or she knowingly engages in conduct which places another in reasonable apprehension of receiving a battery." 720 Ill. Comp. Stat. 5/12-1(a). Mr. Dick argues that the police did not have probable cause to arrest him for assault because when Ms. Collins called the police to report the incident, she did not believe that Mr. Dick's father was in any danger. But whether Mr. Dick's father was in any danger when Ms. Collins called the police is irrelevant as to whether the police reasonably believed that Mr. Dick had committed assault. If Mr. Dick had at any time engaged in conduct that put his father in reasonable apprehension of receiving a battery, then he committed an assault under Illinois law.

There is another problem with finding on this record that there was probable cause to arrest Mr. Dick for assault, which neither party has addressed in its summary judgment briefing. According to the Seventh Circuit, a necessary ingredient of assault is a threatening *gesture*. *Cooper v. City of Chi.*, No. 11 C 6233, 2012 WL 4061039, at *2 (N.D. Ill. Sept. 14, 2012) (citing *Kijonka v. Seitzinger*, 363 F.3d 645, 647 (7th Cir. 2004)). In *Kijonka*, the court held that, under Illinois law, there was no probable cause to arrest a person for assault because no threatening gesture had been made. 363 F.3d at 648. The court denied a prosecutor's claim of qualified immunity because it "[could not] find a reported Illinois case that found the elements of assault satisfied" where there was no threatening gesture. *See id.*

Here, the court is unaware of any evidence in the record suggesting that the police knew that Mr. Dick made any gesture toward his father during their argument. The court therefore cannot conclude that the police had probable cause to arrest Mr. Dick for assault. Because the court has concluded that there was probable cause to arrest Mr. Dick for disorderly conduct, his false arrest claim still fails. *See Holmes*, 511 F.3d at 682 ("[P]robable cause to believe that a person has committed *any* crime will preclude a false arrest claim, even if the person was arrested on additional or different charges for which there was no probable cause . . . .").

\* \* \*

Because the court finds that the police had probable cause to arrest Mr. Dick for disorderly conduct, the court does not reach Defendants' alternative argument that they had probable cause to arrest Mr. Dick for illegally possessing a FOID card and for various offenses related to the threatening letters—offenses for which he was not charged.

**B. Involuntary Commitment**

After Mr. Dick signed an individual recognizance bond slip, Lieutenant Wojcik and Detective Milz drove him the V.A. hospital for a mental health assessment. Plaintiff argues that this constituted an unlawful seizure under the Fourth Amendment because the police lacked probable cause to bring Mr. Dick to the hospital against his will.

Police officers may effectuate an involuntary mental health commitment only if they have probable cause to do so. *See Fitzgerald v. Santoro*, 707 F.3d 725, 732 (7th Cir. 2013). Probable cause exists "only if there are reasonable grounds for believing that the person seized is subject to seizure under the governing legal standard." *Id.* (citations and quotations omitted). In Illinois, the governing legal standard is as follows:

> A peace officer may take a person into custody and transport him to a mental health facility when the peace officer has reasonable grounds to believe that the person is subject to involuntary admission and in need of immediate hospitalization to protect such person or others from physical harm.

405 Ill. Comp. Stat. 5/3-606. If the officers reasonably believed they had probable cause to effectuate the commitment, they are entitled to qualified immunity on this claim.

Here, even construed in the light most favorable to Mr. Dick, the undisputed facts demonstrate that the police had at least arguable probable cause to believe that Mr. Dick was in need of immediate hospitalization to protect himself or others from physical harm. Although Mr. Dick was not charged with any offenses related to sending the threatening letters, the police had a reasonable basis to suspect that he had done so. They knew that the cougar had been shot in Mr. Dick's backyard, so he was one of only a handful of people who had witnessed the shooting. They knew that two neighbors had heard Mr. Dick use anti-Semitic and racist language similar to the language used in the letters. They knew that Mr. Dick had a history of leaving anonymous, threatening notes with one of these neighbors. They knew that he had recently threatened to kill

his father. And they knew that Mr. Dick had the means to carry out an attack, having purchased at least seventeen firearms, including an AR-15 assault rifle and a high-powered sniper rifle.

These facts are undisputed, and the court finds them sufficient to establish that it was reasonable for the police to believe that Mr. Dick had sent the threatening letters. Because that belief was reasonable, it follows that it was reasonable to believe that Mr. Dick was in need of immediate hospitalization to protect others from physical harm, as the letters threatened imminent physical harm to students and police officers. Given the circumstances, the court finds that the officers had at least arguable probable cause to effectuate an involuntary mental health commitment. Accordingly, the officers are entitled to qualified immunity.

## C. Illegal Search

Plaintiff alleges that the police's search of Mr. Dick's home following his arrest was unlawful. Plaintiff admits that Mr. Dick signed a consent-to-search form authorizing Detective Kolliopoulos and Sergeant Kohles to search his residence. Plaintiff argues that this consent was ineffective because Mr. Dick was illegally arrested. As the court has already found that Mr. Dick's arrest was not illegal, Plaintiff cannot argue that his consent was ineffective for this reason. Thus, the court grants summary judgment in favor of Defendants on this claim.

## D. Failure to Train

Plaintiff claims that, under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the City of Chicago is liable for its officers' unlawful arrest of Mr. Dick because it failed to train its officers regarding the gun rights of private detectives and security contractors. A municipality can be held liable under a Section 1983 "failure to train" theory only if the plaintiff proves (1) that the deficient training program caused the plaintiff's constitutional injury and (2)

the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

Here, Plaintiff has not come forward with any evidence to support a claim that the City was deliberately indifferent to Mr. Dick's rights. *See Cornfield by Lewis v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1326 (7th Cir. 1993) ("[A] single isolated incident of wrongdoing by a non-policymaker is generally insufficient to establish municipal acquiescence in unconstitutional conduct."). The police department's policies expressly stated that private detectives could not be charged with possessing unregistered firearms in violation of the municipal ordinance, and municipal entities are not responsible for actions of their employees who operate outside of accepted policy. *See Allen v. Matevey*, No. 10 C 588, 2011 WL 1794749, at *3 (S.D. Ill. May 11, 2011). Accordingly, Defendants' motion for summary judgment on the *Monell* claim is granted.

**E. Conspiracy**

The complaint alleges that Defendants conspired to falsely arrest and prosecute Mr. Dick. Defendants contend that Plaintiff has failed to come forward with any evidence supporting a conspiracy claim. To defeat a motion for summary judgment on a conspiracy claim, the plaintiff "must demonstrate the existence of an agreement or acts 'sufficient to raise the inference of mutual understanding' between the defendants." *Flores v. Walgreen Co.*, No. 08 C 7419, 2010 WL 3894091, at *9 (N.D. Ill. Sept. 30, 2010) (quoting *Admunsen v. Chi. Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000)). Here, the record contains no evidence to suggest that the officers reached any agreement. Accordingly, Defendants are entitled to summary judgment on the conspiracy claim.

**F. Malicious Prosecution**

Plaintiff brings a malicious prosecution claim under Illinois law. "In order to prevail on a malicious prosecution claim [in Illinois], a plaintiff must establish '(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff.'" *Holland v. City of Chi.*, 643 F.3d 248, 254 (7th Cir. 2011) (quoting *Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996)).

As an initial matter, Defendants contend that, because Plaintiff's constitutional claims are barred, the court should decline to exercise supplemental jurisdiction over Plaintiff's state-law malicious prosecution claim. When federal claims are dismissed before trial, there is a general presumption that pendent state-law claims should be left to the state courts. *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1252 (7th Cir.1994). The presumption is not automatic. *Williams Elecs. Games, Inc. v. Garity*, 479 F.3d 904, 906–07 (7th Cir.2007) (noting that jurisidiction over supplemental claims should be retained where substantial federal resources have already been expended on the resolution of the supplemental claims). Here, the court finds that considerations of judicial economy weigh in favor of retaining jurisdiction, and the court exercises its discretion to do so. *See Whitted v. Joshua*, No. 01 C 5489, 2009 WL 2163459, at *3 (N.D. Ill. July 20, 2009) (retaining jurisdiction where case had been pending in district court for significant time and court had already devoted substantial resources in addressing motion for summary judgment).

Turning to the merits, Defendants argue that they are entitled to summary judgment because the charges against Mr. Dick were supported by probable cause. The court has already

found, however, that the officers lacked probable cause to arrest Mr. Dick for violating the municipal gun ordinance. The court has also found that Defendants have not demonstrated on this record that they had probable cause to arrest Mr. Dick for assault. Unlike a false arrest claim, probable cause as to one charge will not bar a malicious prosecution claim based on a second, distinct charge as to which probable cause was lacking. *Holmes*, 411 F.3d at 682.

Defendants also argue that there is no evidence that the officers acted with malice, and that Plaintiff's malicious prosecution claim is therefore barred. To establish malice, the plaintiff is not required show that the defendant was motivated out of personal ill-will, spite, or hatred. *Turner v. City of Chi.*, 415 N.E.2d 481, 487 (Ill. 1980). In this context, malice is defined as "the initiation of a prosecution for any reason other than to bring a party to justice." *Holland*, 643 F.3d at 255 (citing *Rodgers v. Peoples Gas, Light & Coke Co.*, 733 N.E.2d 835, 842 (Ill. 2000)). Where the issue of malice is disputed, it is ordinarily left to the determination of the jury and is not capable of resolution on a motion for summary judgment. *Mut. Med. Plans, Inc. v. Cnty. of Peoria*, 309 F. Supp. 2d 1067, 1083 (C.D. Ill. 2004).

Here, Plaintiff has offered evidence suggesting that there was considerable debate among the officers as to whether they could charge Mr. Dick with violating the municipal ordinance in light of the fact that he was a private detective. (Pl.'s SOF Ex. 2 (Kolliopoulos Dep.) 153-155, ECF No. 131-2.) A jury could reasonably find that the officers charged Mr. Dick not because they believed that he had committed the charged offenses, but rather to garner more time to investigate whether Mr. Dick had sent the threatening letters. *Cf. Williams v. City of Chi.*, 733 F.3d 749, 760 (7th Cir. 2013) (reversing grant of summary judgment in favor of defendants where jury could reasonably find that officers concocted a charge knowing that it was

not supported by probable cause).  Accordingly, Defendant's motion for summary judgment is denied with respect to the malicious prosecution claim.

## G.  Miscellaneous Claims

Defendants seek summary judgment on various other claims that Plaintiff did not address in response to the motion for summary judgment.  These include Plaintiff's claims of excessive force, providing false information in a police report, denying Mr. Dick access to his attorney, providing false information to the Illinois State police and to law enforcement training companies, and state law claims for false arrest and battery.  For each of these claims, Defendants have shown that they are entitled to summary judgment.

The excessive force claim is reviewed under the Fourth Amendment's objective reasonableness standard.  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  The court must examine the "totality of the circumstances to determine whether the intrusion on the citizen's Fourth Amendment interests was justified by the countervailing government interests at stake." *Jacobs v. City of Chi.*, 215 F.3d 758, 773 (7th Cir. 2000).  Once the relevant events have been established—either at trial or through submission of undisputed facts—the question of whether an officer's actions were objectively reasonable is a legal determination, rather than a jury determination.  *Bell v. Irwin*, 321 F.3d 637, 640-41 (7th Cir. 2003).  Here, Plaintiff has not disputed any facts related to the force that the police used to apprehend Mr. Dick.  When the police stopped Mr. Dick's car, two officers approached with their guns drawn and ordered Mr. Dick to put his hands up.  An officer removed Mr. Dick from the vehicle, placed him on the ground, and handcuffed his wrists behind his back.  The officers then stood Mr. Dick up, placed him in an unmarked squad car, and transported him to the 19th District Chicago Police

Department. It is undisputed that Mr. Dick did not suffer any injuries. Based on these facts, the officer's use of force was reasonable.

Plaintiff's claim that Defendants provided false information in the police report "essentially amount[s] to a malicious prosecution claim." *Williams v. Carroll*, No. 08 C 4169, 2009 WL 383623, at *2 (N.D. Ill. Feb. 17, 2009) (citing *McCann v. Mangialardi*, 337 F.3d 782, 786 (7th Cir. 2003)). But because malicious prosecution is a tort under Illinois law, Plaintiff cannot bring a § 1983 claim premised on malicious prosecution. *Newsome v. McCabe*, 256 F.3d 747, 750 (7th Cir. 2001) ("[T]he existence of a tort claim under state law knocks out any constitutional theory of malicious prosecution."). Accordingly, Defendants are entitled to judgment as a matter of law on this claim.

The court grants summary judgment in favor of Defendants on Plaintiff's claim that Mr. Dick was denied an opportunity to contact his lawyer, in violation of his rights under the Fifth and Sixth Amendments. It is undisputed that no statements were ever used against Mr. Dick in a criminal proceeding, so Plaintiff cannot maintain a § 1983 claim premised on a violation of the Self-Incrimination Clause of the Fifth Amendment. *See Chavez v. Martinez*, 538 U.S. 760, 767 (2003) ("Statements compelled by police interrogations of course may not be used against a defendant at trial, but it is not until their use in a criminal case that a violation of the Self-Incrimination Clause occurs." (citations omitted)); *Hanson v. Dane Cnty., Wis.*, 608 F.3d 335, 339 (7th Cir. 2010) ("[I]interrogation that yields incriminatory evidence never used in court does not support an award of damages."). Nor may Plaintiff maintain a § 1983 claim premised on the Sixth Amendment right to the assistance of counsel, as no adversarial criminal proceeding had been instituted against Mr. Dick during the time that he claims he was denied access to a lawyer.

*Watson v. Hulick*, 481 F.3d 537, 542 (7th Cir. 2007) ("[I]nterrogation of a suspect before the filing of a charge, without more, does not trigger the right to counsel.").

The court grants summary judgment in favor of Defendants on Plaintiff's claim that Defendants gave false information to the Illinois State Police and to law enforcement training companies. Defendants have pointed to an absence of evidence to support this claim, and Plaintiff has not come forward with any evidence supporting it. Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Finally, the court grants summary judgment in favor of Defendants on Plaintiff's state-law claims for false arrest and battery. Under Illinois law, battery is the "unauthorized touching" of another that "offends a reasonable sense of personal dignity." *Cohen v. Smith*, 648 N.E.2d 329, 332 (Ill. 1995) (internal quotation marks and citations omitted). The Illinois Tort Immunity Act shields public employees from liability for actions committed "in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 Ill. Comp. Stat. 10/2-202. For the same reason that Plaintiff's excessive force claim fails, Plaintiff's state-law battery claim fails as well. And, as discussed with respect to Plaintiff's § 1983 false arrest claim, Defendants had probable cause to arrest Mr. Dick. Accordingly, his state-law false arrest claim fails. *See Pierce v. Pawelski*, No. 98 C 3337, 2000 WL 1847778, at *2 (N.D. Ill. Dec. 14, 2000) ("Under Illinois law, the 'essential elements of a cause of action for false arrest or false imprisonment are that the plaintiff was restrained or arrested by the defendant, and that the defendant acted without having reasonable grounds to believe that an offense was committed by the plaintiff.'" (quoting *Meerbrey v. Marshall Field Co.*, 564 N.E.2d 1222, 131 (Ill. 1990))).

## IV. Conclusion

Defendants' motion for summary judgment is granted in part and denied in part. Plaintiff may proceed only on the state-law malicious prosecution claim. All other claims are dismissed. Parties are to appear for a status hearing on March 28, 2014, at 9:30 a.m.

ENTER:

_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED:   March 6, 2014